[Civ. No. 21635. First Dist., Div. Three. Jan. 21, 1965.]

SAMSON B. MULLINS, JR., Plaintiff and Respondent, v. EDWARD M. TOOTHMAN, Individually and as Chief of Police, etc., et al., Defendants and Appellants.

Hilton J. Melby, City Attorney (Oakland), and Mark B. Shragge, Deputy City Attorney, for Defendants and Appellants.

Carroll, Davis, Burdick & McDonough for Plaintiff and Respondent.

DEVINE, J.—Plaintiff, a police sergeant acting on behalf of himself and other police officers who claim to be assigned to duties beyond their civil service rating, obtained a writ of mandate against the chief of police, the city manager, the auditor and controller, the city council, and the City of Oakland; and from the judgment ordering the writ comes this appeal. Two sets of officers are involved, namely, 18 or 19 sergeants† and five patrolmen.

### The Sergeants

The whole case shows a purpose of the chief of police, candidly stated by him at the trial and before the city council to make the office of inspector a "terminal" one, that is, to bring about gradually its abolition as the incumbent inspectors

† The numbers are given somewhat variously throughout the record.

retire, die, or are promoted. His further purpose is to substitute sergeants to perform the duties formerly done almost exclusively by inspectors.

Section 27, subdivisions (1) and (4) of the city charter place the police department under the city manager. Section 87 lists ten ranks of police officers, from chief of police to patrolman, and the list includes inspector and sergeant. The section provides that it shall not be incumbent on the city council to create or fill all of the listed positions, and, in fact, there are no officers of the ranks of assistant inspector, corporal or bailiff. The name "inspector" is comparable to that of "detective." Sergeants and patrolmen are eligible for promotion to inspector.

Section 72 of the charter reads: "The [Civil Service] Board shall classify all places of employment now existing or hereafter created under the jurisdiction of the City Manager, ... and no appointment to any such place shall be made, except according to the rules hereinafter mentioned."

The Civil Service Board has the power to enact rules to carry out its purposes (Charter § 73). Among these rules are (1) a provision for classification of positions so that similar requirements as to training, experience, knowledge, skill, personal qualifications, and same rates of pay may be applicable within the same class specifications (Laws and Rules, Civil Service Board, rule 3, § 3.02); and (2) a provision for reclassification of positions, at the instance of the personnel director of the Civil Service Board or of the appointing authority or of an employee (id., rule 3, § 3.05).

In 1955 a proposed charter amendment was placed on the ballot, to authorize a gradual abolishing of the position of inspector of police, and to permit persons of the rank of sergeant to perform the duties then performed by inspectors. This proposition was rejected by the voters. It does not appear whether the chief of police was instrumental in having the amendment proposed, but it is apparent that he supports the principles or policies contained in it.

In January 1961, the chief had completed a survey of 42 other police departments. In 69 per cent, the office of "detective" (which is the same as that of inspector) was below the rank of sergeant, and in 21.4 per cent, the two ranks were equal. The chief was of the opinion that Oakland's department was not in line with other law enforcing agencies in rating inspectors above sergeants. He proposed to the city council that the rank of inspector be kept, but that three va-

cant positions be abolished. He proposed that 10 new sergeancies be created. He argued for flexibility of assignments. The plan had been approved by the city manager, the chief's superior. Counsel for respondent herein argued against the proposal. The council passed the ordinance creating the sergeancies and eliminating three inspectors' places; later, it created 10 more sergeancies.

There followed a series of changes in the organization of the police department, made by the chief. After January 1961 he began to assign sergeants to the Inspectors Division, a unit which had been set up administratively, not by charter or ordinance. Nineteen sergeants were assigned to the Inspectors Division, where they performed investigative work on burglaries and automobile thefts. This work was substantially identical to that done by inspectors. In the summer of 1961, the chief changed the name "Inspectors Division" to "Criminal Investigation Division," but there was no change of duties. Inspectors and sergeants worked in the division.

Meanwhile, extensive hearings were had by the Civil Service Board. The personnel director, who is under the direction of the board, interviewed persons, studied their duties and presented recommendations to the board, which, in general, if accepted by the board, would have sustained the chief of police in his assignment of duties to the sergeants. The board itself heard witnesses.

On November 27, 1962, the board decided that sergeants assigned to the Criminal Investigation Division were working out of classification. On November 30, 1962, the chief changed the name back to Inspectors Division, leaving in it only those who held the rank of inspector. He transferred to a division called "Criminal Information Division" (a preexisting division) all of the sergeants, about 18, who had been in the Inspectors Division. On December 24, 1962, the whole police department moved into a new building, and at that time, the two divisions, Inspectors, composed entirely (except lieutenants and a captain) of inspectors, and Criminal Information, consisting chiefly of sergeants, and having in it no inspectors, were physically separated.

At all times relevant to this litigation, the sergeants have done the same work that they had done when they were in the Inspectors Division. However, their work, both in the Inspectors Division and in the Criminal Information Division, was that of investigating burglaries and auto thefts and did not include the investigation of homicides, robberies, frauds,

forgeries or general thefts. Inspectors' salary at the time of the trial was $752 per month, which is 2 per cent higher than $735, the salary of sergeants. It is the intention of the chief, as inspectors' positions are vacated by attrition, to fill the vacancies with sergeants. It is manifest that the chief does not intend to take any steps toward having an eligible list for inspector created.

The chief testified that as time goes on he will need, according to his plan, more sergeants to take the place of a gradually diminishing number of inspectors. He will choose about one-half of the total number of sergeants to do investigative work. The eligible list for inspectors from which the chief has selected one man from the top three will be eliminated. The elimination will result simply from the chief's abstaining from requesting examinations and eligible lists.

## The Patrolmen

For some time, five patrolmen had worked in the Inspectors Division, on juvenile burglaries, juvenile thefts and moral offenses. On November 28, 1961, the Civil Service Board, on complaint of respondent, found that these men were working out of classification "when performing duties of Inspectors." Thereupon, the chief placed these men under the direction of a sergeant, but their duties remained the same. A second hearing was had by the Civil Service Board, and on May 8, 1962, the board found, despite the fact that they had been placed under supervision, that the men were working out of classification, and also found, not that this was so "when" they were performing inspectors' duties, but that they were actually performing inspectors' duties. The chief removed patrolmen from the morals detail, and assigned inspectors and sergeants to it. He relieved patrolmen of duties in connection with juvenile thefts and juvenile burglaries, and he assigned this work to the burglary detail, manned by sergeants.

On June 28, 1962, the chief created an Inspectional Services Division and assigned the five patrolmen to it. They work in pawnshops, auction sales, junk yards and wrecking yards. The chief testified that their duties are limited to inspectional work. Inspectors formerly had been assigned to these details. They had been free to do investigative work, although they seldom had time to do it. Investigative work is complete; inspectional, merely the gathering of information which is passed on to an investigating officer. Inspectors had been

responsible to a lieutenant; patrolmen in pawnshop, auto wrecking and similar details are responsible to a sergeant. The chief and the patrolmen's commanding officer testified that the pawnshop detail had always been more or less just inspectional, and an inspector produced by respondent testified that the pawnshop detail was a routine thing, quite unlike the homicide detail, where he was then working.

Respondent throughout endeavored, and apparently with success, to show that when inspectors were doing the work now being done by the patrolmen, they were doing routine inspectional work, and very little investigative work; and that, therefore, there had been but little change of function. To this, the chief agrees in part. He has removed the patrolmen from doing any truly investigative work; but he testified that the work formerly was improperly positioned as an inspector's investigative job.

### The Evidence

Besides the documentary evidence, witnesses were produced by both sides. Two patrolmen, who had been assigned to juvenile work before the Civil Service Board's finding of November 28, 1961, testified that their present work in the Inspectional Services Division is considerably different. Sergeant Mullins, the plaintiff who represents the several sergeants and patrolmen, was the only sergeant to testify. The essence of his testimony is that since his transfer from the Inspectors Division to the Criminal Investigation Division he has performed the same duties. In answer to the question, put by the city attorney on cross-examination, how his present duties are outside the specifications drawn by the Civil Service Board for sergeants, he replied that he did not think he was working out of classification, but he believes the specifications are wrong.

Three inspectors testified, in general, that when they had been assigned to the work now comprised within the Inspectional Services Division, their work was mainly inspectional and not investigative.

### The Petition for Writ of Mandate and the Judgment

Because respondent has succeeded completely in his lawsuit on behalf of himself and others, a description of the judgment is also a description of his petition. The court ordered appellants (the chief, the city manager, the auditor and controller, the city council, and the City of Oakland) : (1) to conduct examinations for the position of inspector and to create an

eligible list; (2) to transfer the sergeants, including plaintiff, now working in the Criminal Information Division, and the five patrolmen working in the Inspectional Services Division, "from their present positions of employment, duties, work, functions and responsibilities" and to cause qualified and certified inspectors to be assigned to such positions; and to retain the same number of inspectors unless and until the city council shall have determined that a greater or lesser number of inspectors is required; (3) to pay the difference between the salaries received by the 18 and the amount they would have received as inspectors, from the date they commenced work in the Inspectors Division.

### The Findings

The essential findings of the trial judge are: (1) That defendants planned to abolish the position of inspector, as vacancies would occur, and pursuant to the plan defendants had assigned 19 sergeants and five patrolmen to the work and responsibilities theretofore performed exclusively by persons holding the rank of inspector. (2) That the "work, responsibilities and functions so assigned to and performed by said 'Inspectors' at all times herein mentioned had been and they now are different in significant respects from the work, responsibilities and functions performed by other persons holding different ranks or positions in said department such as Patrolmen, Sergeants, etc." (This finding results from the finding that all of the allegations in paragraph XI of the petition for writ of mandate are true.) (3) The trial judge also finds that hearings have been held before the Civil Service Board and that the board has resolved that the patrolmen and the sergeants who are named are working out of classification, and that all of the positions held by the officers named are at the present time classified by the Civil Service Board as requiring the services of an inspector of police.

### Decision and Reasons for It

#### 1. Power to Classify

■ Appellants state a point in their brief which they had made no mention of in the trial court. They say that the Civil Service Board has no power to classify police officers because the city council has power to decide upon the number of persons required for each of the ranks of police officers. But the charter expressly states, in section 72, that the board shall classify all places under the jurisdiction of the city manager, and the police department is under the jurisdiction

764

of that official. ■ Moreover, section 80 states that the provisions of article XIII, of which section 72 is a part, "shall apply to all appointed officers and employees of the City . . . except . . . The Chief Officials of the City enumerated in Section thirty (30) of this Charter." Section 30 lists as one of the chief officials of the city "a Chief of Police." The specific exclusion of the chief of police from the board's power to classify shows that the board has the power to classify the rest of the ranks in the police department. Besides, if the board does not have power to classify police officers, no one may classify them, because the charter does not give anyone else the power to do so. This result would be contrary to all accepted principles of public administration.

■ Of course, the council has power to determine the number of officers to be provided in any of the ranks mentioned in the charter. The council has the responsibility of providing adequate police protection, and of keeping the expense to the taxpayers limited to the amounts reasonable and necessary. But once the number has been determined by the council, the charter provisions relating to classification go into operation.

### 2. Classification of the Sergeants

■ Is the Civil Service Board's decision that the sergeants are working out of classification sustainable? In their closing brief, appellants argue that the specifications for sergeants include the duties being performed by the sergeants who have been assigned to the burglary and theft details. It is true that in the descriptions of examples of work, and of the knowledges, skills and abilities required for the positions, there is considerable similarity between the descriptions relating to inspectors and those relating to sergeants. However, a comparison of the specifications shows that the inspector's position is the more important in respect of criminal investigation. Both classes of officers may be made responsible for "carrying all phases of a criminal investigation," but an inspector must carry these "through to completion." For the rank of sergeant, three years of service in the rank of patrolman are required, but for that of inspector, one must have four years of any combination of service as patrolman or sergeant. That the rank of inspector is higher is easily inferred. But this is confirmed by the history of the performance of the duties to which the affected sergeants have been, and are, assigned. They do the identical work which they did when they were in the Inspectors Division. It is confirmed by the fact that the recommendations

of the personnel director were rejected by the Civil Service Board. It is confirmed by the fact that the chief forthrightly states that he intends to delegate all of the duties now performed by inspectors to sergeants. The Civil Service Board itself is in excellent position to interpret its own specifications in the light of all of these factors. The conclusion of that board, and of the trial court, that there exists a violation of civil service classification, must be sustained.

Appellants make the point that Sergeant Mullins said that he thought he would not be working out of classification, according to present specifications, but that the specifications themselves were not properly drawn. This, however, is by no means conclusive. The conclusion was for the trial judge, and not for Sergeant Mullins, to draw. Anyway, the answer, in its form, was not positive, and it is subject to the interpretation that, even though the literal words of the specifications might justify the use of the sergeants in their present work, the words, considered in the light of their historical and practical contexts, do not allow the use of sergeants in what the board found to be inspectors' work.

We are not impressed with appellants' argument that the chief accomplished compliance with the decision of the Civil Service Board by separating the sergeants physically and ''organizationally'' (we take it that by this word appellants mean the transfer from one division to another). Rule 3, section 3.02 of the Laws and Rules of the Civil Service Board gives the factors which the board will use in classifying positions as the ''duties, functions and responsibilities'' of the position. These have remained the same despite the physical and organizational change.

We are mindful that the writ of mandate should not be used to interfere with the discretionary powers of an administrative officer. We agree with appellants that a considerable latitude must be allowed to a chief of police in the deployment of his officers. But this case involves the performance of essentially similar duties by two separate ranks of officers in violation of the city's expressed purpose to have similar requirements and rates of pay within the same class specifications. This is in contravention of a finding of the Civil Service Board, which was not successfully overcome in the trial court, that officers are working out of classification in accordance with a settled and permanent plan of the chief of the department. The practice may rightly be prevented by the courts.

### 3. Classification of the Patrolmen

The case of the patrolmen is quite different. When the Civil Service Board found, on November 28, 1961, and again on May 8, 1962, that the five patrolmen were working out of classification, they were performing duties relating exclusively to juveniles in the matter of thefts, burglaries and matters of morals. The change that was made by the chief following the second of these decisions was not merely a physical separation of officers, nor a mere change in the name of a division, section or detail. They were assigned to work in pawnshops, junk yards, etc. The inspectors who had worked in these details were removed from them. There was taken from the patrolmen the right or duty of carrying on investigative work. The patrolmen are required to turn over to officers engaged in the work of investigation the results of their essentially inspectional duties. Following this substantial change, there has been no finding by the Civil Service Board that the patrolmen were still working out of classification during the months from June 1962, when the transfer was made, to January 1963, when the petition for writ of mandate was filed.

The fact that the work in pawnshops, junk yards, etc. had been done by inspectors does not show that it should have been done by them. We are aware of no finding of the Civil Service Board or of the trial court which holds that the five patrolmen have been performing the duties of inspectors since the change in June 1962. Respondent says, in effect, that such a finding was substantially made by the "rejection" by the Civil Service Board of the personnel director's recommendations that the pawnshop and related details should be manned by patrolmen and not by inspectors.

We do not find this argument valid, for several reasons: (1) It appears, without contradiction, that whatever investigative work was done by the inspectors or was expected of them has been eliminated. The fact that the inspectors did not do much investigative work when they were assigned to these details does not indicate that inspectors should be perpetuated in this type of detail. (2) These details (pawnshop, etc.) never were made the subject of separate and independent classifications. There are classifications of inspector, sergeant and patrolman, but there is no such classification, and never has been, of inspector in charge of pawnshop or other detail. If a patrolman working in the pawnshop or similar detail is to be found "working out of classification," it must be because

he *is* performing duties which, under the specifications of the Civil Service Board, are not listed as those of patrolman but are listed as those of another, and higher, rank. We conclude that the patrolmen have not shown that they are presently working out of classification, nor that they must be removed from the duties that have been assigned to them. (Of course, they would not, in any event, be entitled to have an eligible list for inspector created, because under the specifications for inspector they are not eligible.) Apparently, by referring to a "rejection" of the personnel director's recommendations to the Civil Service Board, respondent means failure of that board to reclassify the positions; but, as stated above, there never have been classifications other than those of the few ranks of the police department mentioned in section 87 of the charter.

We conclude that the judgment must be reversed as to the patrolmen and should be remanded for such further proceedings as may be appropriate. We make no ruling on the subject of claimed extra compensation for patrolmen during any period, pending decision by the trial court on remand

### 4. *Salaries*

Appellants point out, correctly, that respondent has not given us any case law to sustain the award of the additional salary that was allowed by the trial judge, and we have not found any authority ourselves. Appellants have supplied cases, such as *Martin* v. *Henderson*, 40 Cal.2d 583 [255 P.2d 416], wherein it was held that in the absence of statutory provision therefor, a person holding a public office with a fixed salary, such as highway patrolman, cannot legally claim additional compensation for overtime. ▮▮ We believe, however, that legislative authority for payment to the sergeants of the same salary as that paid to inspectors is to be found in section 91b of the Oakland City Charter. This section allows the chief to assign an officer of the next lower rank to any temporary vacancy, and provides that the assigned officer shall receive the salary attached to the rank to which he may be assigned. Although the chief's assignments of the sergeants were not formally made, they may fairly be regarded as having been within the charter section.

There are, however, two limitations which must be imposed upon the award of increased salary. The first relates to the number of vacancies in the rank of inspector, and the second to time of commencement of the increased salaries.

(a) Since the increment in salaries must have statutory

authority (*Martin* v. *Henderson, supra*), and since the only statutory authority available is section 91b of the charter, the judgment for increased salary cannot exceed the provisions of that section. The section allows the increased salaries only when there are vacancies in the next higher rank. Therefore, the number of salary increases must be limited to the number of vacancies in the rank of inspector existing at any of the relevant times. Surely the chief could not, by assigning officers in accordance with section 91b, provide for a greater number of increases in compensation than there were vacancies in the next higher rank; and if he could not do so by deliberate and formal action under the section, he could not do it by his unintended but, as we hold, effective temporary assignments. If the number of vacancies has been less than the number of sergeants assigned to do the work of inspectors, adjustment will have to be made, in this representative action, by the trial court under such considerations as are equitable.

 Respondent's argument that an action on *quantum meruit* may lie against a city (*Buck* v. *City of Eureka*, 124 Cal. 61 [56 P. 612]) would not sustain an award beyond the statutory authorization. In the *Buck* case, plaintiff was not a salaried employee at the time covered by his claim. He was not subject to the rule stated in *Martin* v. *Henderson, supra, Pootel* v. *City & County of San Francisco*, 125 Cal.App.2d 378 [270 P.2d 553], and *Welshans* v. *City of Santa Barbara*, 205 Cal.App.2d 304 [23 Cal.Rptr. 108], forbidding extra compensation for salaried employees except as allowable by statute or ordinance.

Nor are such special circumstances present as existed in *Lorenson* v. *City of Los Angeles*, 41 Cal.2d 334 [260 P.2d 49], cited by respondent. In that case, plaintiff's failure to file a salary claim within the time limited by the charter resulted from postponements, caused by his superiors, of charges brought against plaintiff. There is no pleading or finding of estoppel in the case before us.

 (b) Considering that the sole source of right of any of the sergeants to increased compensation is section 91b of the charter, we look to a reasonable time to be designated as the "temporary assignment" of the sergeants. This we believe to be the date on which the Civil Service Board first found that they were working out of classification, namely, November 27, 1962. We take note of respondent's argument that there has been no pleading of the statute of limitations. We do not regard the setting of a commencement date for the inferred

assignments under section 91b as being determined by the statute of limitations. We merely select this date as the one on which it can fairly be said that the chief must be deemed to have made temporary assignments to the next higher rank. █ Interest is allowable, as the trial court adjudged. *Mass* v. *Board of Education*, 61 Cal.2d 612, 624 [39 Cal.Rptr. 739, 394 P.2d 579].)

Judgment is reversed insofar as it relates to the five patrolmen, and is remanded for further proceedings consistent with this opinion. Judgment is affirmed as it relates to the sergeants, but is modified by directing the trial court to allow increases in salary only as to the number of vacancies in the rank of inspector existing at the relevant times and to set the commencement date for such increases as November 27, 1962. Each side to bear own costs on appeal.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied February 18, 1965, and respondent's petition for a hearing by the Supreme Court was denied March 17, 1965.